**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| IN RE: ) | CASE No. | 20-21458 (JJT) |
| ) | | |
| CHIP'S SOUTHINGTON, LLC ) | CHAPTER | 11 |
| Debtor. ) | | |
| ) | RE: ECF Nos. | 324, 337, 338, 343, 372, 374, 378 |

**POST-TRIAL MEMORANDUM OF DECISION ON DEBTOR'S SECOND**
**AMENDED CHAPTER 11 PLAN AND VALUATION OF CERTAIN COLLATERAL**

**I.    Introduction**

The Debtor, Chip's Southington, LLC ("Chip's" or "Debtor"), is one of five locations of "Chip's Family Restaurant," a local family-friendly breakfast and brunch restaurant, well-known throughout Connecticut for its atmosphere, and, most significantly, its pancakes. Like many other local and family run small businesses in the restaurant industry, starting in March 2020, the Debtor's business suffered a severe reduction in revenue and ability to operate due to the COVID-19 pandemic and the related restrictions put in place by the State of Connecticut. Due to the detrimental impacts of Covid, the Debtor was unable to pay the monthly rent due under its ground lease, and, in an attempt to avoid a potential eviction, on December 29, 2020, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and elected treatment as a Subchapter V small business debtor. ECF No. 1.

On September 30, 2021, the Debtor filed its Second Amended Chapter 11 Plan. ECF No. 324 (the "Plan"). Under the Plan, the claim of M&T Bank, the Debtor's primary secured lender, in the amount of $1,199,033.89, is classified as the sole claimant in Class 1. The Plan bifurcates M&T's Claim[1] into an $880,000 secured claim (which amount the Debtor argues represents the

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

value of M&T's lien[2] reduced to the fair market value of the collateral ("Collateral") it is secured by and a deficiency general unsecured prepetition claim for the amount of the debt exceeding that value (approximately $319,000).

With regard to the secured portion of M&T's Claim, the Plan proposes to pay M&T $6,631.00/month commencing as of April 28, 2022. In the time between the Effective Date and April 2022, the Plan defers the payment of interest, principal, and other payments, and provides that such amounts will not be paid until maturity of the loan. The Plan provides that the balance of the M&T secured claim, including the deferred payments from the Effective Date to April 2022, would be paid on the fifth anniversary of the Effective Date. With regard to the unsecured portion of M&T's Claim, the Plan proposes that it be treated as a Class 2 unsecured claim. Under the Plan, General Unsecured Creditors (Class 2) will receive an aggregate 10% distribution over five years commencing on the first anniversary of the Effective Date.

M&T objected to the Plan, and more specifically, to its treatment thereunder. ECF No. 337 (the "Objection"). The gravamen of M&T's Objection centers around the Debtor's valuation of its Collateral, which in turn, affects the amount of M&T's secured claim and its treatment under the Plan. The Debtor has valued its leasehold interest in its ground lease at $531,000 and its furniture, fixtures, and equipment ("FF&E") at $260,000, for an aggregate value of $791,000.[3]

---

[2] M&T Bank provided a mortgage loan to the Debtor in the principal sum of $1,200,000, evidenced by a promissory note signed by the Debtor on or about October 25, 2016, secured by an open-end construction leasehold mortgage, security agreement, and fixture filing. M&T also filed a UCC-1 lien against the personal property of the Debtor. The Debtor, in each Cash Collateral Order, admitted to the validity and priority of M&T's lien.

[3] The Debtor's $880,000 figure in its Plan for the secured portion of M&T's Claim includes an estimated value for certain types of Collateral that will be addressed at a later date in Segment 2 of this opinion. Those types of Collateral include the payroll tax refund arising from the ERTC, the proceeds of the BI Claim, and the Intercompany Receivables.

M&T, on the other hand, argues that the leasehold interest is valued between $1.25 million and $3.1 million, and that the FF&E is valued at $297,850. In addition to the valuation of the leasehold and FF&E, the parties also disagree on the value of, and M&T's entitlement to, certain other assets of the Debtor, including its Intercompany Receivables, its Employee Retention Tax Credits ("ERTC"), and a Business Interruption Claim ("BI Claim").

As the confirmation hearing on the Debtor's Second Amended Plan approached, and as the valuation disputes persisted, the parties agreed that, as a threshold matter, the Court should hear and determine the outstanding valuation issues before holding a plenary confirmation hearing under Sections 1129 and 1191. Accordingly, the Court segmented the confirmation proceedings to first address the issues surrounding the valuation of the leasehold and the FF&E ("Segment 1"), and to then hear and determine the issues concerning the Debtor's interests in the payroll tax refund arising from the ERTC, the proceeds of the BI Claim, and the Intercompany Receivables, as well as the scope of M&T's Lien as it relates to the aforementioned Collateral ("Segment 2"). At the final portion of the confirmation hearing ("Segment 3"), the Court will hear any remaining concerns and objections to confirmation of the Debtor's Plan under Sections 1129 and 1191.

The Court held a hearing on Segment 1 on October 26 and 27, 2021, whereat the Debtor and M&T presented competing valuation evidence with respect to the fair market value of the Debtor's leasehold interest in the leasehold and its FF&E. During Segment 1, the Debtor adduced expert appraisal testimony from its appraiser, John W. Nitz of John W. Nitz & Associates, LLC, who employed an income capitalization approach to determine the value of the leasehold at $531,000, assessing the actual capitalized rental incomes under the Debtor's lease, as well as actual rents from the comparable leaseholds. In contrast, M&T's expert appraiser,

3

Cushman & Wakefield ("C&W"), opined as to the cost to the Debtor to replace its rights under the Ground Lease, concluding that it would cost $3.1 million in the current market to replicate its rights to the land and building to which it presently has access to under the Ground Lease. C&W also advanced a valuation of the leasehold using an income capitalization approach, which valued the Debtor's leasehold interest at $1.25 million. With respect to the Debtor's FF&E, both appraisers used a comparable cost approach to determine the replacement value, with Nitz's approach valuing the FF&E at $260,000 and C&W's approach valuing the FF&E at $297,850.

At the conclusion of Segment 1, the Court directed the parties to file supplemental briefs delineating why each party's respective position and valuation should be adopted, as well as framing arguments with respect to the issues to be determined in Segment 2. Once the supplemental briefs were filed, the Court took the matter under advisement. For the reasons stated herein, the Court finds that the value of the Debtor's leasehold interest is $531,000 as advanced by the Debtor, and that the value of the FF&E is $297,850 as advanced by M&T.

## II. Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## III. Background

The Debtor is one of five locations of "Chip's Family Restaurant," a local family-friendly breakfast and brunch restaurant, well-known throughout Connecticut for its atmosphere and its pancakes. The Debtor is a Connecticut limited liability company managed by its sole member, Kaiaffa, LLC, also a Connecticut limited liability company. Kaiaffa's sole member is George Chatzopoulos. Mr. Chatzopoulos is the primary executive manager of all locations.

The Debtor is lessee of the pad underneath its restaurant pursuant to a ground lease agreement (the "Ground Lease") entered into between the Debtor and Execwest Retail, LLC (the "Landlord"), a Delaware limited liability company, on August 11, 2016. The Ground Lease is for a forty-year term composed of an original fifteen-year term, plus five five-year extensions to the original term at the Debtor's election. The Ground Lease expires in 2057. The leasehold granted under the Ground Lease consists of a one-story, steel frame restaurant facility located at 99 Executive Boulevard North, Southington, Connecticut (the "Restaurant") together with the underlying parcel of land (the "Leasehold Estate"). The Restaurant was built in 2017 and has a gross building area of 4,484 square feet, which includes up to 2,000 square feet of customer space and up to 80 parking spaces. Site improvements include a macadam-paved parking and driveway area, pole-mounted lighting, and landscaping. The Restaurant is part of The Village Shops shopping plaza, a 54,623 square foot plaza situated on 9.07 acres of land area.

On October 25, 2016, the Debtor, executed and delivered to M&T a Small Business Administration Note in the original principal amount of $1,200,000.00 (the "Note"). This loan was made under the Small Business Administration's Section 7(a) loan program and was used to finance the construction of the Debtor's Restaurant. The Note was secured by, *inter alia*, an Open-End Construction Leasehold Mortgage, Security Agreement and Fixture Filing dated October 25, 2016 (together with the Note, the "Loan Documents"). The Mortgage encumbers substantially all of the Debtor's assets, which includes the Debtor's interest in the Leasehold Estate (the "Leasehold Interest") as well as the Debtor's FF&E. The Debtor and M&T later modified the repayment terms of the Note on June 1, 2017.

Beginning in March 2020, Governor Ned Lamont issued a series of executive orders in response to the COVID-19 outbreak that forced the Debtor to temporarily stop serving food. *See*

ECF 362 (Court's Order after hearing taking judicial notice of the COVID-19 pandemic and related executive orders). Prior to March 2020, the Debtor was able to successfully maintain its business. Since March 2020, the Debtor suffered a severe reduction in revenue and ability to operate and thus was unable to pay the monthly rent due under to the terms of the Ground Lease.

On December 29, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code. Pursuant to 11 U.S.C. § 1184, the Debtor continued to operate its business and manage its properties, affairs, and assets as debtor-in-possession. On March 29, 2021, the Debtor filed its Chapter 11 Small Business Subchapter V Plan of Reorganization, which was amended on August 16, 2021, and after an initial hearing filed its second amended plan on September 30, 2021. ECF Nos. 128, 269, 324 (the "Plan"). On February 23, 2021, M&T Bank timely filed a proof of claim for $1,038,254.16, plus additional unliquidated amounts due and owing under the Loan Documents, including post-petition interest and fees, and pre- and post-petition attorneys' fees and costs. Claims Register, Claim No. 8-1 ("M&T's Claim").

M&T Bank and the Subchapter V Trustee both objected to confirmation of the Plan. ECF Nos. 289, 337, 338. As discussed above, the parties fully briefed their respective arguments concerning M&T's treatment under the Plan and the valuation of the Debtor's Leasehold Interest and FF&E, among other things.[4] At the trial for Segment 1, M&T and the Debtor each offered an expert appraiser on the valuation of the Leasehold Interest and the FF&E.

The Debtor's appraiser, Mr. Nitz, authored a report that established the "as-is market value" of the Leasehold Interest as of August 31, 2021. ECF No. 345-10, Joint Trial Exhibit 10 (the "Nitz Appraisal"). Mr. Nitz concluded in his report that the market value of the Debtor's

---

[4] The facts stated in the Introduction of this opinion are incorporated herein by reference.

Leasehold Interest was $531,000.00. Nitz Appraisal at 6. The testimony from Mr. Nitz at trial established the following details. Mr. Nitz testified that he excluded the cost approach from his analysis because it only applied to fee simple interests and not leasehold interests. He also excluded the sales comparison approach from his analysis because there was a lack of comparable sales of leasehold estates in the area. His ultimate conclusion relied on the income capitalization approach. Mr. Nitz employed both an income and rent comparison approach (also known as a direct capitalization and discounted cash flow analysis) to determine the value of the Property. The comparable leaseholds he reviewed were all proximately located to the Property. He based the valuation on the actual capitalized rental incomes under the Ground Lease, as well as actual rents from other similar properties. He also applied a discount rate of 9% to reflect a more risky investment environment for potential investors in light of COVID-19's impact on the restaurant industry.

  M&T Bank's appraiser, Edward DeCapua of Cushman & Wakefield ("DeCapua"), authored a report that established the market value of the Leasehold Interest as of August 20, 2021 and provided two hypothetical valuation scenarios. ECF No. 345, Joint Trial Exhibit 8 (the "DeCapua Appraisal"). DeCapua concluded that the as-is market value of the Leasehold Interest was $1.4 million. DeCapua Appraisal at 4. The testimony from Mr. DeCapua at trial established the following details. In his first hypothetical valuation scenario, he concluded that the value of the Leasehold Interest was $1.25 million. *Id.* In his second valuation scenario, he concluded that the leased fee interest was $3.1 million. Similar to Mr. Nitz, DeCapua excluded the sales comparison approach due to a lack of sufficient data for leasehold interest sale transactions. *Id.* Unlike Mr. Nitz, DeCapua utilized both the cost approach and the income capitalization approach in formulating his opinion, giving the income capitalization approach the most weight.

DeCapua Appraisal at 49. DeCapua applied a 7% discount rate. DeCapua's report claims that it considers the effects of COVID-19 but finds that "the subject property did not appear to have suffered the full effect of the economic downturn as the businesses near the property have continued operating and the tenants have reportedly continued to pay rent with no rent reported in arrears." DeCapua Appraisal at 4. Most notably, DeCapua testified that, even though his report captured the Leasehold's value as of August 2021, he did not factor into his analysis any impact of COVID-19 on the restaurant industry, including disruptions to the supply chain and a lack of quality labor.

As for the FF&E, Mr. Nitz concluded in his report that the market value of the Debtor's FF&E was $260,000.00. Nitz Appraisal at 6. M&T Bank offered a value of the Debtor's FF&E through a second expert appraiser, David Koller of Cushman & Wakefield, who opined that the fair market value of the FF&E was $297,850.00. ECF 345-9, Joint Exhibit 9 at 3 (the "Koller Appraisal"). The delta between the two FF&E appraisals is $37,850.00.

After the conclusion of Segment 1, the parties filed numerous supplemental briefs on the different valuation issues. ECF Nos. 367, 372, 374, 375, 378. Their arguments primarily focus on what the correct method for determining the replacement value of the Leasehold Interest should be.

## IV.    Discussion

The Court is faced with making a difficult determination as to the fair market value for two different categories of collateral: the Debtor's Leasehold Interest in its Ground Lease between the Debtor and its Landlord, and the FF&E used to generate income on the premises of the Debtor's Restaurant. The parties agree that replacement value, *i.e.*, fair market value, is the proper standard of valuation in a Chapter 11 case proceeding under the Bankruptcy Code's cram

down provisions where the debtor retains possession of the collateral for purposes of using it to produce income. The parties also agree that this standard of valuation applies regardless of whether the collateral is a fungible good, such as equipment, or something more complex, such as a leasehold interest. The parties disagree, however, on how replacement value should be determined. The licensed appraisers hired by each party come at this question from different perspectives.

The Court will first discuss the appropriate standard of valuation in a Chapter 11 case and then address the substantive merits of the parties' arguments concerning the valuation methodology used by their respective appraisers. This Court's determination herein of the value of the subject collateral will in turn contribute to the resolution of three critical issues: (1) the determination of M&T's claims for purposes of payment under the plan, (2) the determination of whether the value of M&T's lien rights will be adequately preserved if the secured claim is to be paid over time, and (3) application of the best interest of creditor's test. *See* 4 Collier on Bankruptcy P 506.03 (16th 2021).

A discussion of the appropriate standard of valuation begins with the relevant cram down provisions that apply in a Subchapter V case for a small business debtor proceeding under Chapter 11 of the Bankruptcy Code. Subchapter V modifies the rules under which particular classes of claims can be crammed down. In traditional Chapter 11 cases, a court may confirm the plan over objection of an impaired, non-consenting class if the plan satisfies the Bankruptcy Code's cramdown provisions under § 1129(b), which include the requirement that at least one impaired class must have accepted the plan under § 1129(a)(10).[5] Subchapter V permits a court

---

[5] Section 1191(b) does not incorporate the absolute priority rule that applies in traditional Chapter 11 cases. The absolute priority rule, therefore, does not apply in Subchapter V cases, which means that a Subchapter V plan may be crammed down on unsecured creditors even if stockholders, who are junior to unsecured creditors, retain their equity under the plan.

to disregard § 1129(a)(10) and cram down a plan even if no impaired class of claims accepts the plan upon proper findings. In a small business case under Subchapter V, Section 1191(b) governs confirmation of a plan proceeding under cram down, which allows a court to confirm a plan if (1) the plan does not discriminate unfairly against any impaired, non-consenting class, and (2) the plan is fair and equitable regarding each class of impaired claims or interests that has rejected the plan. In addition, Section 1191(c)(1) provides that, with respect to a class of secured claims, the condition that the plan be fair and equitable includes the requirements of Section 1129(b)(2)(A).

In a case where an impaired, non-consenting class is composed of one or more secured claims, Section 1129(b)(2)(A) provides that a plan is fair and equitable if each secured creditor either: retains the lien securing its claim and receives deferred cash payments totaling at least the allowed amount of its secured claim, 11 U.S.C. § 1129(b)(2)(A)(i); receives the "indubitable equivalent" of the value of its claim, 11 U.S.C. § 1129(b)(2)(A)(iii); or, receives a lien on the proceeds of a sale of its collateral (free and clear of its lien) subject to its rights to purchase the property by credit bidding its secured claim against the purchase price under § 363(k), 11 U.S.C. § 1129(b)(2)(A)(ii).

The option for lien retention and deferred cash payments under § 1129(b)(2)(A)(i) readily applies to situations, such as this one, where the debtor chooses to maintain possession of the collateral to continue generating streams of income. This option requires a determination of the value of the creditor's interest in the collateral, which in turn requires identifying the proper valuation method. The Bankruptcy Code does not specify a standard of valuation, but instead requires that value should be "determined in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). In this case, the Debtor will

retain its Leasehold Interest in its Ground Lease and retain possession of its FF&E for the purpose of continuing to produce revenues.

Although the Bankruptcy Code calls for a case-by-case valuation standard, the Supreme Court held that replacement value is the proper standard for the valuation of collateral. *See Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997).[6] The *Rash* case involved a Chapter 13 cram down case where the debtor retained possession of its truck to produce income. *Id.* at 953−54. The Court in *Rash* defined replacement value as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960. In other words, replacement value is the fair market value of the property. The Supreme Court did not view the terms "replacement value" and "fair market value" as necessarily being incompatible. *Id.* at 959 n.2. By replacement value, the Court meant "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Id.* The Court did not suggest "that a creditor is entitled to recover what it would cost the debtor to purchase the collateral brand new." *Id.* The Court left to bankruptcy courts, as triers of fact, the task of identifying the best method of ascertaining replacement value on the basis of the evidence presented. *Id*. at 965 n.6. The Court also left open the question of whether replacement value "is the equivalent of retail value, wholesale value, or some other value" because that determination depends on "the type of debtor and the nature of the property." *Id.*

Although *Rash* was decided in the context of a Chapter 13 cram down case, courts have generally applied *Rash* to valuations of collateral in Chapter 11 cram down cases. *See, e.g.*, *In re*

---

[6] *Rash* abrogated the Second Circuit's decision in *In re Valenti*, issued just months prior, where the Second Circuit determined that bankruptcy courts had discretion to determinate which valuation standard to use on a case-by-case basis. *In re Valenti*, 105 F.3d 55 (2d Cir. 1997), *abrogated by Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997). Specifically, the Court in *Rash* "reject[ed] a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases." *Rash*, 520 U.S. at 965 (*citing In re Valenti*, 105 F.3d at 62−63).

*Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012) (applying *Rash* to value a secured claim under § 506(a) in connection with Chapter 11 plan of reorganization and holding that proper measure is collateral's fair market value); *see also In re Motors Liquidation Co.*, 482 B.R. 485, 492 (Bankr. S.D.N.Y. 2012) ("[p]ost–*Rash* case law suggests that *Rash* can be applied to the provisions of all three reorganization chapters—11, 12, and 13—because these chapters all treat secured claims similarly"); 4 *Collier on Bankruptcy* (16th Ed.) ¶ 506.03[7][d][i], p. 506-75 ("[f]ollowing *Rash*, to fix the amount of the claim for payment purposes [under a plan], the relevant methodology should be that of a hypothetical purchase by the debtor (i.e., replacement value)").

Determining replacement value for fungible collateral, such as an automobile, is a fairly straightforward exercise where the proper measure of replacement value is either the retail or wholesale price and, if retail, whether appropriate reductions should be made to account for the creditor's value-added services. *Id.* Determining the replacement value of real estate is decidedly more complex. "There are three accepted methods of valuation which may be used for the assessment of real property: (1) the comparable sales approach; (2) the income [capitalization] approach; and (3) the reproduction cost less depreciation or cost approach. Methods of valuation, 9A Conn. Prac., Land Use Law & Prac. § 45:10 (4th ed.). "The methods of appraisal are used to determine the highest and best use of the property, which is the starting point for analysis of fair market value and which is commonly defined as the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." *Id.*

The cost approach generally applies to fee simple interests in real property. Under the cost approach, the appraiser forms an opinion of the cost of all improvements, depreciating them

to reflect any value loss from physical, functional and external causes. Land value, entrepreneurial profit and depreciated improvement costs are then added, resulting in a final opinion of value. The sales comparison approach is generally used for improved properties or vacant land and is the most common method of valuation when comparable sales data is available. Under the sales comparison approach, sales of comparable properties are typically adjusted for differences to estimate a value for the subject property. The income capitalization approach is generally applied to income-producing properties. Under the income capitalization approach, the income-producing capacity of a property is estimated by using contract rents on existing leases and by estimating market rent from rental activity at competing properties for the vacant space. Deductions are then made for vacancy and collection loss and operating expenses. The resulting net operating income is divided by an overall capitalization rate to derive a final opinion of value.

Valuation of a leasehold interest in a ground lease presents a uniquely complex question. A leasehold interest is generally not valued by use of comparison to sales of comparable property because leaseholds are rarely sold. Neither party introduced evidence as to any sales of comparable leaseholds. "The value of a leasehold is generally measured by determining the future rent payments that the leasehold would likely generate over its term, less any rent that the owner of the leasehold would be required to pay, discounted to present value." *In re UAL Corp.*, 374 B.R. 625, 631 (Bankr. N.D. Ill. 2007), *aff'd sub nom. UMB Bank, N.A. v. United Airlines, Inc.*, No. 07C5888, 2008 WL 4866188 (N.D. Ill. June 12, 2008), *rev'd sub nom. United Air Lines, Inc. v. Reg'l Airports Imp. Corp.*, 564 F.3d 873 (7th Cir. 2009), *and aff'd sub nom. Reg'l Airports Improvement Corp. v. UMB Bank, N.A.*, No. 07 C 5890, 2008 WL 2566927 (N.D. Ill.

June 25, 2008)*, and rev'd sub nom. United Air Lines, Inc. v. Reg'l Airports Imp. Corp.*, 564 F.3d 873 (7th Cir. 2009).

The Court will now address the two competing appraisals offered at trial. Where, as is the case here, the secured creditor has asserted in its proof of claim that it is fully secured, it is the debtor's burden to establish that such claim is not fully secured. *See In re Heritage Highgate, Inc.*, 679 F.3d at 139; *see also In re Ellis*, No. 16-30870 (AMN), 2017 WL 3822018, at *5 (Bankr. D. Conn. Aug. 28, 2017) (holding that debtors "bear the initial burden of proof to overcome the characterization in the proof of claim that the entire debt is secured"). Upon such showing, the burden then shifts to the creditor who has the "'ultimate burden of persuasion . . . to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim.'" *In re Heritage Highgate, Inc.*, 679 F.3d at 140.

At trial, both the Debtor and M&T Bank offered appraisals prepared by a licensed appraiser to establish an opinion as to the fair market value of the Debtor's Leasehold Interest and the Debtor's FF&E. No objections were advanced regarding the expert qualifications of either appraiser. The parties do not have serious disagreements about the disparity between each appraiser's opinion of the replacement value for the FF&E because the numbers were very close. The main point of contention between the Debtor and M&T involves the replacement value of the Leasehold Interest. The Court will first address the evidence presented on the value of the Leasehold Interest.

In its supplemental brief, the Debtor argues that M&T's Leasehold Interest appraisal evidence should be disregarded by the Court because (1) a cost approach cannot establish the fair market value of the Property and (2) M&T's appraiser's income approach valuation did not adjust comparable rents for differences between properties and applied a discount rate

"untethered to reality." ECF No. 374. Specifically, the Debtor argued that the cost approach used by M&T's appraiser only identifies the cost to rebuild an existing structure, not the fair market value of the property in its current condition. M&T argued that only its appraiser valued the true replacement cost of the Debtor's Leasehold Interest in its Ground Lease because the Debtor's appraiser provided a value predicated on M&T foreclosing the Mortgage on the Ground Lease and subletting the Property to a new tenant. *See* ECF No. 372.

After a full and deliberative examination of the trial record and the referenced appraisal reports, and in the exercise of its discretion over the appropriate valuation methodology and its assessment that the current challenges to the hospitality/restaurant industry call for a higher discount rate, this Court finds that the Nitz Appraisal on the Leasehold Interest is more credible and consistent with recognized appraisal methodologies for a leasehold estate.[7] Unlike Mr. DeCapua, Mr. Nitz chose comparable leasehold rental rates with locational attributes very similar to the Restaurant, with four of his seven comparable leaseholds in Southington itself. *See* Nitz Appraisal at 53; DeCapua Apraisal at 59; *see also In re UAL Corp.*, 351 B.R. 916, 920 (Bankr. N.d. Ill. 2006) (holding that location is an "essential attribute of real estate," that a proper comparable "should provide all of the locational advantages of the subject property" and that *Rash* suggests that "like property should be as much like the collateral as possible"). Mr. Nitz's opinion is also more reflective of the risks and significant market uncertainties that are inherent in such restaurant operations and the real estate market that fulfills the need for a competitive physical location. *See Rash*, 520 U.S. at 965 n.6 (leaving open to bankruptcy courts the question of whether replacement value "is the equivalent of retail value, wholesale value, or some other value" because that determination depends on "the type of debtor and the nature of

---

[7] At trial, Mr. Nitz testified that his report accounted for the fact that the Debtor did not have a reversionary interest in the Restaurant.

the property"). The Court has disregarded the hypothetical valuation scenarios contained in the DeCapua Appraisal because they do not reflect the true replacement value of the Debtor's Leasehold Interest in its Ground Lease. *See Rash*, 520 U.S at 959 n.2.

Furthermore, the Court does not agree with M&T Bank that the value of the Leasehold Interest in August 2021 could somehow be equal to its pre-pandemic value. Additional evidence admitted at trial showed that M&T had appraised the Debtor's Leasehold Interest in February 2020 at a value of $1.4 million, right before the onset of the COVID-19 pandemic. ECF 345-31, Joint Exhibit 31. It does not follow that the value of the Leasehold Interest remained at $1.4 million throughout the pandemic, as suggested by Mr. DeCapua. *Cf. United Airlines, Inc. v Regional Airports Imp. Corp.*, 564 F.3d 873, 878−79 (7th Cir. 2009) (holding that discount rate of 10% was too high given that being a proprietor of terminal space at that airport was not particularly risky at the time due to airport operating at full capacity). At trial, the Court took judicial notice of generally known facts regarding COVID-19, including reports from the Connecticut Restaurant Association that the prognosis for the industry was uncertain and that, as of August 2021, at least 600 restaurants had failed in Connecticut. *See* ECF 362 (Court's Order after hearing taking judicial notice of the COVID-19 pandemic and related executive orders). The local restaurant industry, by virtue of its current failure rates, demonstrates increased vacancies in such properties and calls for a risk adjustment consistent with revenue losses and escalating costs of goods and labor.

The Court will now address the evidence presented on the value of the FF&E. In the opinion of the Court, as to the FF&E valuations, the opinions of each respective appraiser were so negligibly at variance at to constitute an adjustment error. The Koller Appraisal, however, contains the indicia of more discernment, more reliable detail of the items, and references to the

markets for new and used FF&E. The Court accordingly weighs such testimony more heavily and concludes that, in light of its thoroughness and above-referenced attributes, that C&W advances a credible and sustainable fair market valuation of $297,850 for the FF&E.

V.    **Conclusion**

Accordingly, in sum, the Court finds, for purposes of confirmation of the Debtor's Plan, that the fair market values are $531,000 for the Debtor's Leasehold Interest and $297,850 for the Debtor's FF&E, for an aggregate value of $828,850. The lowest threshold amount for the secured portion of M&T's Claim is therefore $828,850. In Segment 2 of this trial, the Court will determine the value, if any, of additional Collateral securing M&T's Claim, which includes the Debtor's interests in the payroll tax refund arising from the ERTC, the proceeds of the BI Claim, and the Intercompany Receivables.

**IT IS SO ORDERED** at Hartford, Connecticut this 13th day of November 2021.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut

17